STATE OF MAINE                    BUSINESS AND CONSUMER COURT
Cumberland, ss.
                                  AMH-CUM-7/19/2012

NICOLE RICHMAN, JULIE HOWARD,
JOHN THIBODEAU, and MARYANN
CARROLL, on behalf of themselves and
others similarly situated,

                Plaintiffs

        v.                                Docket No. BCD-CV-10-53

POSSIBILITIES COUNSELING
SERVICES, INC., WENDY L.
BERGERON, AFFILIATE FUNDING, INC.,
EMILE L. CLAVET, KEVIN DEAN,
AND FOSTER CARE BILLING, LLC
d/b/a PROVIDER FINANCIAL

                Defendants

## ORDER ON AFI DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Before the court is the Motion for Summary Judgment of Affiliate

Funding, Inc., ("AFI") and Foster Care Billing, Inc. d/b/a Provider Financial,

Kevin Dean, Emile Clavet, ("the AFI Defendants") and the opposition thereto of

the Plaintiff class. For the reasons stated, the Motion is granted.

### *Background*

In 2005, Defendant Wendy Bergeron started Defendant Possibilities

Counseling Services, Inc. ("PCS"). (Def. S.M.F. ¶ 1.) PCS entered into service

agreements with numerous mental health service providers, including members

of the Plaintiff class, pursuant to which PCS handled the submittal and

processing of insurance claims for services rendered by the providers to their clients. (Def. S.M.F. ¶2.) There are two types of insurance claims under the terms of these service agreements: 1) those billable to Maine's Medicaid program known as MaineCare, and 2) those billable to other third party or private insurers. The parties have referred to the second type as Explanation of Benefits ("EOB") claims. Under the service agreements, PCS would pay the clinician the amount due on a MaineCare claim within two weeks of receipt of the billing, and would remit payment on the EOB claims fifteen days after PCS received payment from the third party payer. (Def. S.M.F. ¶¶6,8.)

PCS entered into a purchase agreement with AFI's predecessor in April 2006, under which AFI would purchase PCS's accounts receivable that were less than 60 days old.[1] (Def. S.M.F. ¶¶11-14.) As a result of this agreement, it was possible for PCS to make timely payment to the clinicians on a weekly basis even before PCS received payment on those claims from MaineCare or the third party insurers. (Def. S.M.F. ¶16.)

Plaintiffs were not parties to this contract, but allege that they were intended third-party beneficiaries to the contract between PCS and AFI. Prior to commencement of this lawsuit, however, none of the named plaintiffs (or the class members) had ever been in communication with any of the AFI defendants. (Def. S.M.F. ¶¶38-41.)

---

[1] The agreement was amended on July 25, 2010.

2

In August 2010, due to several disagreements between PCS and AFI, AFI gave PCS 30 days notice that it intended to terminate the purchase agreement, effective September 24, 2010. (Def. S.M.F. ¶ 22.)

Meanwhile, individuals with an ownership interest in AFI founded a new mental health agency, Health Affiliates of Maine ("HAM"), to perform essentially the role as PCS had been. (Def. S.M.F. ¶¶ 25-26, as qualified.) Because HAM was not able to secure a necessary operating license until November 1, 2010, AFI agreed to continue its relationship with PCS for the month of October.

In November 2010, the individuals who controlled AFI and HAM caused the clinician class members to receive an advance of funds sufficient to reimburse them for their October MaineCare billings. (S.M.F. ¶ 26.) This advance came in the form of a direct payment from HAM to the individual clinicians totaling $550,275.[2] (Def. S.M.F. ¶ 26, as qualified.)

On December 1, 2010, AFI and PCS entered into a settlement agreement and corresponding service agreement that obligated both parties to conduct claims processing activities on behalf of the clinicians. (Pl. S. Add'l M.F. ¶ 45.) Based on indications that the State of Maine had reservations about making payments for MaineCare services directly to either PCS or AFI, the court in this case elected in January 2011 to create a mechanism under which the State could

---

[2] Plaintiffs contend that the actual amount was $561,000. (Pl. Opp'n S.M.F. ¶ 26.) AFI Defendants characterize this disbursement as payment from HAM on behalf of AFI because the funds to support the disbursement were first advanced from AFI to HAM. (Def. Reply to Pl. S. Add'l M.F. ¶ 78.) Plaintiffs contend that the payment was made by HAM merely to advance its own business interests, and the payment was not made in compensation for the unpaid October claims.

3

make the payments into a court-supervised fund established and controlled by a court-appointed referee. *See* Order Appointing Referee, *Richman, et al. v. Possibilities Counseling Services, Inc., et al.*, Docket No. BCD-WB-CV-10-53 (Me. Super. Ct., Jan. 25, 2011). The State of Maine elected to make payment of amounts due to the plaintiff class members for MaineCare-covered into one or more accounts managed by the referee, for distribution to the clinicians entitled to receive the proceeds, even though the State presumably could have directed the payments instead to one or more of the Defendants. *See* Order Permitting Release of Funds, *Richman, et al. v. Possibilities Counseling Services, Inc., et al.*, Docket No. BCD-CV-10-53, 2 (Me. Super. Ct., Apr. 14, 2011).

In July 2011, the court certified a class that included the following:

> All social service providers licensed in Maine with written agreements as independent contractor affiliates of possibilities Counseling Services, Inc. in effect any time from November 1, 2009 through October 31, 2010 ("the Class Period"), whose claims are limited to damages for unpaid claims for payment submitted by the provider (including any claim that no processing fee should be deducted from the face amount of the claim), interest and costs. Any providers whose claims for damages extend beyond the just-stated limitation are hereby excluded from the class because their claims are not typical of those of the Class.

Order Granting Class Certification, *Richman, et al. v. Possibilities Counseling Services, Inc., et al.*, Docket No. BCD--CV-10-53, 1-2 (Me. Super. Ct., Jul. 12, 2011).

AFI's claims-processing activity focused initially on claims for MaineCare reimbursement, for which AFI collected a total of $1,674,373, of which $757,137 was paid over to the clinicians, resulting in the reimbursement of 100% of their

MaineCare claims.[3] (Def. S.M.F. ¶¶ 27-29.)

After all claims for MaineCare reimbursement were completed, AFI turned its attention to processing EOB claims. (Def. S.M.F. ¶ 30.) Many of the EOB claims had become "stale," and as a result only a small amount has been received for reimbursement of EOB claims. (Def. S.M.F. ¶ 33.) AFI and PCS agreed with the Referee that, notwithstanding the inability to collect payment on most of the EOB claims submitted by the plaintiff class clinicians, the clinicians should be paid the full value of their EOB claims from funds held by the referee that had been received from MaineCare but had not been used to reimburse the MaineCare claims. (Def. S.M.F. ¶ 4.) The referee then released a total of $293,971 to clinicians for their EOB claims. (Def. S.M.F. ¶ 35.) In total, class members have received $1,051,108.00 from the referee's account for EOB and MaineCare disbursements. (Pl. S. Add'l M.F. ¶ 76.)

In April 2011, the court ordered the referee to release $338,000 of funds to AFI, stating that the action "should be taken as more of a cash flow decision than a pronouncement on the merits of either side's position." *See* Order Permitting Release of Funds, *Richman, et al. v. Possibilities Counseling Services, Inc., et al.*, Docket No. BCD-CV-10-53, 3 (Me. Super. Ct., Apr. 14, 2011). AFI had requested this release of funds as compensation for performing claims processing activities and for reimbursement of the October advances. (Pl. S. Add'l M.F.

---

[3] There is a dispute regarding whether, at some point, AFI ceased processing claims in violation of the terms of the service agreement. (Pl. Opp'n S.M.F. ¶ 27.) However, there is no dispute that any violation has not caused actual loss to the plaintiff class, which has been paid the full amount of MaineCare and EOB claims for the class period.

5

¶57, as qualified.) The disbursement was made on the basis of AFI's representation that it had used its own funds to reimburse the plaintiff class. *See id.* In total, AFI has received $430,237,76 in distributions from the referee's account. (Pl. S. Add'l M.F. ¶48.)

Currently, although not all EOB claims attributable to the class period have been formally processed between AFI and the third party payers because some claims have expired, the clinicians in the plaintiff class have been paid what they would have received had all EOB claims been timely processed. (Def. S.M.F. ¶36, as qualified.)

AFI Defendants have moved for summary judgment on all remaining counts of Plaintiffs' Complaint, contending that they are not liable under any of the theories of recovery set forth therein, and, alternatively, that Plaintiffs cannot demonstrate that they have suffered any damages as a result of AFI's actions.

In opposition to the AFI Defendants' motion, Plaintiffs assert that there are genuine issues of material fact relating to AFI's liability and the amount of damages that remain uncompensated.

Plaintiffs' primary contentions include the following: Plaintiffs are third party beneficiaries to the service agreement between PCS and AFI; AFI breached that agreement when it ceased to process claims; under the collateral source rule, the AFI Defendants cannot be "credited" with the HAM disbursement, thus Plaintiffs have remaining claims for damages; the court should order AFI Defendants to set aside an award of attorney fees under *Savoie v. Merchants Bank*

6

*et al.*, 84 F.3d 52 (2d Cir. 1996); and the court should impose a sanction of attorney fees on AFI defendants for their alleged misrepresentation of the source of the HAM disbursement.

## *Discussion*

This analysis addresses each of the counts of the complaint as to which the court certified the plaintiff class, and examines whether there are any genuine issues of material fact and whether the AFI defendants are entitled to judgment as a matter of law.

To survive a motion for summary judgment on a claim as to which the non-moving party has the burden of persuasion, the non-moving party must make out a *prima facie* case on each element of the claim that the motion puts into contention. *See Quirion v. Geroux*, 2008 ME 41, ¶9, 942 A.2d 670, 673 (negligence claim); *Reliance Nat'l Indem. v. Knowles Indus. Servs. Inc.*, 2005 ME 29, ¶9, 868 A.2d 220 (subrogation); *Rippett v. Bemis, supra*, 672 A.2d at 84 (defamation). Here, the Plaintiffs have the burden of proof on all of their claims.

As a threshold matter, it is undisputed that the named Plaintiffs and Plaintiff class have been paid for all claims within the scope of class certification.[4] Admittedly, the Plaintiff class received full payment of claims later than contemplated by class members' agreements with PCS, but any damages apart from the face amount of the claims resulting delay in payment are outside the scope of the class certification, because such damages would be consequential,

---

[4] The providers who opted out of the class and thereby excluded themselves from this case have evidently also received payment in full for the claims covered in the complaint, as amended.

7

arising from an individual provider's particular circumstances, rather than common to the entire class of providers.

The AFI Defendants suggest that the fact that the Plaintiff class has been made whole for all class claims should bring an end to the entire case. For two reasons, the court disagrees. First, as a general principle, the fact that a plaintiff is made whole during the pendency of a case does not preclude an award of costs should the plaintiff otherwise deserve such an award. Second, the Plaintiff class argues that the Defendants should not be credited with the payment made by HAM. Accordingly, it remains necessary to address the merits of the AFI Defendants' motion.

I. Breach of Contract (Count II)

Plaintiffs allege that the AFI Defendants breached both the initial purchase agreement with PCS and the subsequent service agreement executed with PCS as part of the settlement agreement. Plaintiffs seek to enforce their rights under the contracts as intended third party beneficiaries of those agreements.

In order for Plaintiffs to survive a summary judgment motion and proceed as third party beneficiaries on a contract theory, they must generate a genuine issue of material fact on the element of the contracting parties' intent that they receive an enforceable benefit under the respective contracts. *Devine v. Roche Biomedical Lab.*, 659 A.2d 868, 870 (Me. 1995) ("*Devine II*"). It is not enough that plaintiffs did benefit or could have benefited from the performance of the

8

contract. *Id.* The intent to benefit must be clear and definite, whether it is expressed in the contract itself or in the circumstances surrounding its execution. *F.O. Bailey Co., Inc. v. Ledgewood, Inc.*, 603 A.2d 466, 468 (Me. 1992). If PCS and AFI did not intend to confer upon the clinicians an enforceable right, any benefit enjoyed by the clinicians as a result of the performance of the contract renders them incidental beneficiaries who cannot sue to enforce third party beneficiary rights. *Id.*

The inquiry turns to each of the two contracts at issue.

A. Purchase Agreement Between PCS and AFI

The record clearly demonstrates that the clinicians who contracted with PCS for billing services were not intended third-party beneficiaries of the purchase agreement between PSC and AFI.

The purchase agreement details the terms of AFI's exclusive right to purchase PSC's accounts receivable that are less than 60 days old, and contains details about the purchase price and processing fees applicable to such accounts. The contract requires creation of various accounts that will facilitate the parties' relationship. Paragraph 14 states that AFI shall not be deemed to have assumed liabilities relating to, or arising out of, the accounts. The amendment to the purchase agreement, dated July 24, 2010, states that AFI shall incur no liability for failing or refusing to fund the Purchase of Accounts, unless doing so would constitute a breach of the underlying agreement.

9

This was in effect a financing arrangement designed to enable PCS to meet the cash flow needs associated with its commitment to pay clinicians on their claims before actually receiving payment from MaineCare and the EOB insurers. There was nothing about this arrangement that suggests any intention to benefit the clinicians, as opposed to benefiting PCS and AFI. In that regard, this financing arrangement was similar to the myriad financing arrangements in the business world. Absent special circumstances, the customers of a business that obtains financing do not have third-party beneficiary status for purposes of the financing, and those special circumstances do not appear here. *See Devine II*, 659 A.2d at 870. Plaintiffs have failed to demonstrate that there is any question of material fact unique to the nature of this specific purchase agreement that demonstrates any intent on the part of PCS and AFI to create an enforceable right for the third party class members.

Accordingly, the AFI Defendants' motion for summary judgment on the breach of contract claim arising from the purchase agreement is granted.

B. The Settlement and Service Agreements of December 1, 2010 between PCS and AFI

In February 2012 the Plaintiffs supplemented their Amended Consolidated Class Action Complaint to include a breach of contract claim arising from AFI's alleged failure to timely process EOB claims in violation of the Service Agreement between PCS and AFI executed on December 1, 2010.

The Plaintiffs' contentions, as explained at the hearing held on April 27, 2012, proceed as follows: 1) Plaintiffs were third-party beneficiaries under the

10

settlement agreement; 2) AFI breached the agreement when it ceased processing EOB claims; 3) but for AFI's failure to process some of the claims, there would be more money in the referee's account. The depleted funds in the referee's account could potentially harm the plaintiffs in two ways: a) if PCS and AFI defendants should not be "credited" with HAM advance, Plaintiffs are owed additional funds, and if there were more money in the referee's account, Plaintiffs could recover such funds; or 2) if Plaintiffs are entitled to attorney fees under *Savoie*, or as a sanction, they would benefit from more funds available in the referee's account.

The court does not accept Plaintiffs' reasoning. First, the service agreement was executed after the October advances had been distributed to clinicians, and therefore that disbursement could not have been made in fulfillment of AFI's obligations under a subsequent service agreement. Second, the collateral source rule would not bar subtraction of those amounts from AFI's total liability, assuming AFI was found liable for damages resulting from its alleged failure to process all claims in a timely fashion.

Under the collateral source rule, a collaterally provided benefit, such as unemployment insurance or workers' compensation benefits, is not to be subtracted from a plaintiff's recovery from the defendant, thus avoiding a potential windfall to the party liable for the harm suffered. *See Potvin v. Seven Elms, Inc.*, 628 A.2d 115, 116 (Me. 1993). The same rule applies in non-tort contexts, including actions for breach of contract. *Id.* The rule would be inapplicable in regard to the HAM payment, however, because payments made by

11

an entity that is not jointly liable, such as HAM, will diminish the claim of the injured person against others responsible for the same harm if the payments are made in compensation of that claim. *See* Restatement (Second) of Torts § 885 Comment F.

Payments from a source independent of the party liable do not operate to reduce the party's liability, but payments from a source on behalf of a liable party are credited to the party. Thus, an injured party's health insurance benefits and workers' compensation benefits are not credited against the defendant's liability, whereas payments made by the defendant's own insurance carrier are. Within this framework, HAM is associated with all of the defendants. The payment by HAM was plainly intended to substitute for the payments due to the plaintiff class members from PCS, so payments by HAM indeed serve to reduce and eliminate the liability of any and all defendants to the Plaintiff class members.

The Plaintiffs argue that the HAM payment should not be credited because HAM made the payment for its own business purposes. They also cite to cases involving voluntary payments in which the payor was denied recoupment. Neither point is relevant here—HAM is not seeking to recover what it paid and it matters not why HAM made the payment. It is sufficient that HAM's payment was clearly intended to compensate the Plaintiff class for the amounts due on their claims from any Defendant or other source.

Accordingly, HAM's payment does operate to reduce and eliminate any liability of the Defendants to the Plaintiff class for claims within the scope of the class certification.

Second, even assuming, without deciding, that Plaintiffs were third party beneficiaries under the December 1 service agreement, and that AFI breached that agreement, the Plaintiff class's asserted harm remains speculative. Plaintiffs' loss is predicated on there being insufficient funds in the referee's account with which to fund a potential award of attorney fees, even though there is no applicable fee-shifting provision in the service agreement under which plaintiffs assert their claims.[5]

In a breach of contract action, the defendant may not be liable for damages that were not within the contemplation of the parties when the contract was entered into. *Forbes v. Wells Beach Casino, Inc.*, 409 A.2d 646, 654-55 (Me. 1979).

Plaintiffs' argument is that, at the time AFI entered into the service agreement, it should have foreseen that its failure to maximize the funds in the referee's account would harm the Plaintiffs because, at some future date, Plaintiffs would be entitled to an attorney fee award which AFI would be unable to satisfy from its own funds, and therefore Plaintiffs would need to collect additional money from the referee's account as compensation for the fee award. The

---

[5] The only fee-shifting agreement that even arguably applies to the providers is a provision in the PCS agreement obligating the provider to pay PCS's attorney fees if PCS prevailed in an action against the provider under a non-solicitation provision in the same agreement. That attorney fee provision could be applied reciprocally if the provider prevailed in such a suit under the same non-solicitation provision, but it cannot reasonably be expanded to apply reciprocally to any and all breaches of the PCS-Provider contract by either party.

13

potential fee award, when coupled with the other necessary contingencies in plaintiff's theory of injury, is insufficient to constitute a definite and foreseeable harm for the purposes of sustaining a breach of contract action.

Also, the Plaintiff class's requests for attorney fees, both under *Savoie* or as a sanction for litigation misconduct, are more appropriately considered in regard to the separate motions addressing those issues, and should not be entangled with questions pertaining to Defendants' liability raised in the current motion for summary judgment. The United States Supreme Court has explained, that as a general rule, "a claim for attorney fees is not part of the merits of the action to which the fees pertain" because such an award is separate from remedy the injury giving rise to the action.[6] *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 200 (1988).

The AFI Defendants' motion for summary judgment on the breach of contract claim arising from the service agreement is therefore granted.

## II. Tortious Interference (Count III)

To prevail on a tortious interference claim, plaintiffs must show: (1) the existence of their valid contract with PCS; (2) the defendant interfered with that contract through fraud or intimidation, and (3) that such interference proximately caused damages.

A valid contract existed between PCS and the Plaintiff clinician class in the form of the service agreements. Plaintiffs allege that AFI interfered with this

---

[6] For this same reason, plaintiffs' allegation that there are genuine disputes of material fact as to whether the class has a viable claim for attorney fees does not preclude the grant of summary judgment for the AFI defendants. (*See* Pls.' Opp'n to AFI Defs.' Mot. Summ. J. 16.)

14

relationship through a "prolonged pattern of intimidation." (Pl. Opp'n Def. Mot. Summ. J. 10.) Intimidation is defined as "unlawful coercion, extortion, duress, or putting in fear." *State v. Janisczak*, 579 A.2d 736, 738 (Me. 1990) (citation omitted).

Plaintiffs assert that the acts of intimidation included: AFI controlling revenue generated by the PCS-AFI purchase agreement; cutting checks to clinicians with AFI's business address on them; switching the forwarding address on a joint mail box to AFI's address; and asserting its rights regarding the amount of money in the "reserve account" created under the purchasing agreement. No reasonable jury could conclude that these alleged actions amounted to acts of extortion, duress, or intimidation. Summary judgment is granted to the AFI defendants on the claim of tortious interference.

III. "Equitable" Claims

Plaintiffs also allege Accounting[7] (Count V), Money had and Received[8] (Count VIII), Unjust Enrichment (Count IX), Conversion (Count X), and Constructive Trust (Count XI). All of these claims share the common requirement that the AFI Defendants have been in possession of funds or property to which the Plaintiff class held title or some other ownership interest, or that the Plaintiff class conferred a benefit upon Defendants. *See Ketch v. Smith*, 161 A. 300, 300 (Me. 1932) (money had and received); *Estate of White*, 521 A.2d

---

[7] "Accounting" is more appropriately characterized as an equitable remedy for a potential unjust enrichment claim.

[8] An action of assumpsit for money had and received arises in law, though it is "equitable in spirit and purpose." *Greenlaw v. Rodick*, 158 Me. 440, 446, 185 A.2d 895, 898 (Me. 1962).

15

1180, 1183 (Me. 1987) (unjust enrichment); *Baizley v. Baizley*, 1999 ME 115, ¶ 6 734 A.2d 1117 (constructive trust); *Withers v. Hackett*, 1998 ME 164, ¶ 7, 714 A.2d 791 (conversion).

In support of its unjust enrichment claim, the Plaintiff class contends that AFI failed to process EOB claims yet still received distributions from the referee's account for its processing services. Even were such the case, there is no indication in the record that AFI received funds in which the Plaintiff class had any ownership interest or that any class members have bestowed any benefit upon the AFI Defendants. The Plaintiffs assert that it would be unfair for AFI to receive funds for processing claims if it did not perform the full extent of that service. Given that the Plaintiff class has been paid in full for class claims, it simply lacks standing to make that argument. There are no facts in the summary judgment record suggesting that this perceived inequity has affected any legal rights of any class members. No accounting is not necessary. The AFI Defendants are entitled to summary judgment on Counts V, VII, IX, X, and XI.

## IV. Fraud (Count IV) and Negligent Misrepresentation (Count VI)

The elements of fraud include (1) that one party made a false representation; (2) of a material fact; (3) with knowledge of its falsity or in reckless disregard of whether it is true or false; (4) for the purpose of inducing another party to act in reliance upon it; and (5) the other party justifiably relied upon the representation as true and acted upon it to its damage. *Flaherty v. Muther*, 2011 ME 32, ¶ 45, 17 A.3d 640 (citation omitted).

16

One may be found liable for negligent misrepresentation if, in the course of any transaction in which he has a pecuniary interest, he fails to exercise reasonable care in communicating false information to others and causes pecuniary loss by their justifiable reliance upon the information. *Rand v. Bath Iron Works Corp.*, 2003 ME 122 (Me. 2003).

Because fraud and negligent misrepresentation claims both require proof of actual reliance, these counts were not certified as to the plaintiff class, and can only be asserted by individual plaintiffs. *See* Order Granting Class Certification, *Richman, et al. v. Possibilities Counseling Services, Inc., et al.*, Docket No. BCD-CV-10-53, 4 (Me. Super. Ct., Jul. 12, 2011).

Moreover, both causes of action require some showing that AFI or its representatives made some representation or communication to the Plaintiff class. The evidence is undisputed that no individual affiliated with AFI ever made any relevant representations to any named Plaintiff or class member. The AFI defendants' motion for summary judgment on these counts is granted.

V. Negligence (Count VII)

The AFI Defendants also move for summary judgment on Plaintiff's negligence claim. Plaintiffs do not directly oppose the motion for summary judgment on this specific count. Moreover, the record does not contain facts, disputed or otherwise, sufficient to establish that the AFI Defendants owed any duty of care to Plaintiffs. *Brawn v. Oral Surgery Assocs.*, 2003 ME 11, ¶ 17, 819

17

A.2d 1014 ("whether a party owes a particular duty of care to another is a question of law"). Summary judgment is therefore granted on Count VII.

*Conclusion*

Based on the foregoing analysis the court concludes and orders:

The AFI Defendants' Motion for Summary Judgment is GRANTED.

Pursuant to M. R. Civ. P. 79(a), the clerk is hereby directed to incorporate this Order by reference in the docket.

Dated: 18 July 2012

A. M. Horton
Justice, Business & Consumer Court

18

STATE OF MAINE          BUSINESS AND CONSUMER COURT
Cumberland, ss.

NICOLE RICHMAN, JULIE HOWARD,
JOHN THIBODEAU, and MARYANN
CARROLL, on behalf of themselves and
others similarly situated,

        Plaintiffs

        v.                        Docket No. BCD-CV-10-53

POSSIBILITIES COUNSELING
SERVICES, INC., WENDY L.
BERGERON, AFFILIATE FUNDING, INC.,
EMILE L. CLAVET, KEVIN DEAN,
AND FOSTER CARE BILLING, LLC
d/b/a PROVIDER FINANCIAL

        Defendants

## ORDER ON PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND PCS DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT

Before the court is the Plaintiffs' Motion For Partial Summary Judgment against Defendants PCS and Wendy Bergeron, known as the "PCS Defendants." The PCS Defendants have opposed Plaintiff's motion, and have also filed a cross motion for summary judgment. For the reasons stated below, both motions are granted in part, and otherwise denied.

### *Background*

In 2005, Defendant Wendy Bergeron started the mental counseling agency Possibilities Counseling Services, Inc. ("PCS"). (PCS S. Add'l M.F. ¶ 1.) PCS entered into service agreements with numerous mental health service

providers, including members of plaintiff class, pursuant to which PCS would administer the providers' billing. (Pl. S.M.F. ¶ 1.) There are two types of claims under the terms of these service agreements: 1) those billable to MaineCare primary and 2) those billable to other third party or private insurers. (*Id.*) The latter are known as Explanation of Benefits ("EOB") claims. Under the service agreements, PCS would pay the clinician the amount due on a MaineCare claim within two weeks of receipt of the billing and it would remit payment on the EOB claims fifteen days after PCS received payment from the third party payer. (*Id.*)

This billing arrangement was mutually advantageous because the State was paying significantly lower rates to providers who did not bill through an agency; thus, the providers received precisely the same amount for each claim that they would have received had they independently performed their MaineCare billing, however by contracting with Possibilities they received the payment much faster. (*See* PCS S. Add'l M.F. ¶ 2.) In turn, PCS would receive compensation for its services on account of the State's policy of paying higher reimbursement rates for claims submitted through an agency.

PCS entered into a purchase agreement with Defendant Affiliate Funding, Inc. ("AFI") in April 2006, under which AFI would purchase PCS's accounts receivable that were less than 60 days old.[1] As a result of this agreement, it was possible for PCS to obtain a funding source with which it could

---

[1] The original purchase agreement was with AFI's predecessor, FRI. (PCS S. Add.'l M.F. ¶ 6.) The details of this agreement are more fully outlined in the court's previous order on the AFI Defendants' Motion for Summary Judgment.

2

timely pay the clinicians on a weekly basis. (Pl. S.M.F. ¶6.) In September 2010, AFI sued PCS for breach of the purchase agreement, and in response PCS asserted various counterclaims against AFI. (Pl. S.M.F. ¶¶7-8.) In the meantime, individuals with an ownership interest in AFI founded a new mental health agency, Health Affiliates of Maine ("HAM") that would essentially perform the same functions as PCS. Because HAM was not able to secure a license until November 1, 2010, AFI agreed to continue its relationship with PCS for the month of October, and in November 2010 AFI advanced funds to the clinicians sufficient to reimburse them for their October MaineCare billings. This advance came in the form of a direct payment from HAM to the individual clinicians totaling $550,275.

The litigation between PCS and AFI resulted in a settlement agreement between the parties in December 2010. (Pl. S.M.F. ¶11.) The settlement agreement and corresponding service agreement obligated PCS to work with AFI in good faith in order to process all of the clinicians' pending unpaid claims with service dates between November 1, 2009 and October 31, 2010. (Pl. S.M.F. ¶¶13, 16.) AFI would perform all of the billing for PCS pursuant to the service agreement. (Pl. S.M.F. ¶28.)

The court appointed John Fidrych as Referee to oversee the billing and reconciliation process. (Pl. S.M.F. ¶25.) The funds in the Referee's account were supplemented when the State of Maine chose to deposit MaineCare reimbursements directly into the account, even though the State presumably

3

could have directed those payments to one or more of the Defendants. *See* Order Permitting Release of Funds, *Richman, et al. v. Possibilities Counseling Services, Inc., et al.*, Docket No. BCD-CV-10-53, 2 (Me. Super. Ct., Apr. 14, 2011).

Under the terms of the service agreement, AFI first processed all claims for MaineCare reimbursement and collected a total of $1,674,373, of which $757,137 was paid over to the clinicians, resulting in the reimbursement of 100% of their MaineCare claims. (PCS's S. Add.'l M.F. ¶41.) After all claims for MaineCare reimbursement were completed, at the direction of the Referee AFI turned its attention to processing EOB claims. Many of the EOB claims had expired or become "stale," and as a result only a small amount has been received for reimbursement of EOB claims. (PCS's S. Add'l M.F. ¶43.) AFI and PCS agreed with the Referee that clinicians should be paid the full value of their EOB claims from funds held by the Referee that had been received from MaineCare but had not been used to reimburse the MaineCare claims. The Referee then released a total of $293,971 to clinicians for their EOB claims. (*Id.*) In total, class members have received $1,051,108.00 from the Referee's account for EOB and MaineCare disbursements. (Pl. S.M.F. ¶46.) AFI has received $430,237.76 in distributions from the Referee's account and PCS has received $74,950. (Pl. S.M.F. ¶¶41-42.)

Currently, although not all EOB claims have been formally processed between AFI and the third party payers, the clinicians have been compensated from other available funds to the same extent that they would have if the EOB

4

claims been processed through the third party payers, though plaintiffs dispute whether AFI and PCS should be "credited" with the disbursement that was provided from HAM in regard to the October billings.

In July 2011, the court certified a class that included the following:

All social service providers licensed in Maine with written agreements as independent contractor affiliates of Possibilities Counseling Services, Inc. in effect any time from November 1, 2009 through October 31, 2010 ("the Class Period"), whose claims are limited to damages for unpaid claims for payment submitted by the provider (including any claim that no processing fee should be deducted from the face amount of the claim), interest and costs. Any providers whose claims for damages extend beyond the just-stated limitation are hereby excluded from the class because their claims are not typical of those of the Class.

Order Granting Class Certification, *Richman, et al. v. Possibilities Counseling Services, Inc., et al.*, Docket No. BCD-CV-10-53, 1-2 (Me. Super. Ct., Jul. 12, 2011).

The plaintiff class has moved for partial summary judgment on PCS Defendants' liability for breach of contract and unjust enrichment in regard to their service agreements directly with PCS and as third party beneficiaries to the settlement agreement between PCS and AFI. The PCS Defendants have opposed plaintiff's motion for summary judgment, and have filed a cross motion for summary judgment on all counts of the class complaint.

## Discussion

I.    Standard of Review

Summary judgment should be granted if there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. M.R. Civ. P. 56(c). The court will consider "'only the portions of the record referred

5

to, and the material facts set forth in the [M.R. Civ. P. 56(h)] statements.'" *F.R. Carroll, Inc. v. TD Bank, N.A.*, 2010 ME 115, ¶ 8, 8 A.3d 646 (quoting *Deutsche Bank Nat'l Trust Co. v. Raggiani,* 2009 ME 120, ¶ 5, 985 A.2d 1). "Summary judgment is appropriate when review of the parties' statements of material facts and the referenced record evidence, considered in the light most favorable to the non-moving party, indicates that no genuine issue of material fact is in dispute." *Blue Star Corp. v. CKF Props. LLC,* 2009 ME 101, ¶ 23, 980 A.2d 1270.

To survive a motion for summary judgment on a claim as to which the non-moving party has the burden of persuasion, the non-moving party must make out a *prima facie* case on each element of the claim that the motion puts into contention. *See Quirion v. Geroux,* 2008 ME 41, ¶9, 942 A.2d 670, 673 (negligence claim); *Reliance Nat'l Indem. v. Knowles Indus. Servs. Inc.,* 2005 ME 29, ¶9, 868 A.2d 220 (subrogation); *Rippett v. Bemis, supra,* 672 A.2d at 84 (defamation). Here, the Plaintiffs have the burden of proof on all of their claims.

## II.   The Collateral Source Issue

A threshold issue that ought to be addressed initially is whether, in light of the collateral source rule, the PCS Defendants are entitled to a credit against what would otherwise be their liability to Plaintiff class members for the funds paid to the class by HAM.

Under the collateral source rule, collaterally provided benefits paid to or on behalf of an injured plaintiff by a source independent of the defendant, such as health or medical insurance payments or workers' compensation benefits, are not

6

subtracted from the plaintiff's recovery from the defendant, thus avoiding a potential windfall to the party liable for the harm suffered. *See Potvin v. Seven Elms, Inc.*, 628 A.2d 115, 116 (Me. 1993). The same rule applies in non-tort contexts, including actions for breach of contract. *Id.* The rule would be inapplicable in regard to the HAM payment, however, because payments made by an entity that is not jointly liable, such as HAM, will diminish the claim of the injured person against others responsible for the same harm if the payments are made in compensation of that claim. *See* Restatement (Second) of Torts § 885 Comment F.

As explained in the order on the AFI Defendants' motion for summary judgment entered this day, the AFI Defendants are entitled to credit for the HAM payment, in large measure because HAM and AFI are owned and controlled by the same individuals. There is no such direct link between HAM and the PCS Defendants, so the justification for crediting the HAM payment to any liability on the part of the PCS Defendants is less clear. On the other hand, the collateral source rule focuses on whether the source of payment is "independent of the tortfeasor." *Werner V. Lane*, 393 A.2d 1329, 1335 (Me. 1978).

Because the effect of the payment was to make the individual and class member Plaintiffs whole as to all damages recoverable on the claims within the scope of the class certification, the effect of the HAM payment, regardless of how it was intended, was to preclude any further award of damages on class claims against any of the Defendants.

7

III.    Breach of Contract (Count I)

It is undisputed that there was a contract between PCS and plaintiff class members in the form of the individual service agreements. (Pl. S.M.F. ¶ 1.) PCS's responsibilities included processing MaineCare reimbursement, providing billing services on EOB claims, making payment to clinicians two weeks after MaineCare services were rendered, and making payments within 15 days of receipt of funds on EOB claims. (Pl. S.M.F. ¶ 1.) The contract also required that PCS provide 90 days notice of terminating the service agreements. (Pl. S.M.F. ¶ 5.)

Plaintiffs allege that PCS breached the contract when it failed to timely process claims and failed to provide 90 days notice prior to termination of its services to the plaintiff class. The plaintiffs have moved for summary judgment on the issues of the existence of the contract and the breach of the contract, and request a subsequent hearing on damages. The PCS Defendants oppose Plaintiffs' motion and have moved for summary judgment on the breach of contract claims. The central disputes pertain to PCS's alleged material breach of the service agreements and the resulting damages alleged to have been suffered by members of the class.

A. Failure to Timely Process Claims

The Plaintiff class contends that "PCS admits that it breached the PCS/Plaintiff Class Agreement in that it failed to timely process claims, whether primary or secondary payors, for the members of the Plaintiff Class." (Pl. S.M.F.

8

¶ 4, as qualified by PCS S. Opp'n M.F. ¶ 4.) The PCS Defendants appear to dispute whether there has been a formal admission[2], but the undisputed facts make it clear that PCS failed to remit payment to the Plaintiff provider class for certified class MaineCare claims within the time frame required by the contract between PCS and the providers. The evidence of breach is less clear as to the EOB claims because payment was due only after PCS itself received payment, but the undisputed fact that some of the EOB claims of the Plaintiff class have gone stale is evidence that PCS failed to process EOB claims as well in a timely manner. Therefore, the Plaintiff class has shown it is entitled to prevail on the issue of whether PCS breached the contract as to all providers who submitted MaineCare claims, and breached the contract as to stale EOB claims as well.

However, the PCS Defendants assert that proof of a breach of contract is not enough to justify obtaining judgment on a breach of contract claim—there must also be proof of damage or loss resulting from the breach.

Actual injury or damage is an essential element of a breach of contract claim. *In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*, 2010 ME 93, ¶ 8, 4 A.3d 492 (opinion in response to certified question from Federal District Court for the District of Maine). The PCS Defendants argue that, because the

[2] Plaintiffs assert that PCS, through Wendy Bergeron, has admitted that PCS made late payments in violation of its contractual duties. (Pl. S.M.F. ¶ 4.) In support of this statement, plaintiffs cite the transcript of the Rule 30(b)(6) deposition of Wendy Bergeron in her capacity as designee for PCS. *See* PCS Depo. Tr. 119:5-18; 368:7-12.) In the Plaintiffs' statement of additional material facts offered in opposition to the PCS Defendants' cross motion, Plaintiffs add another citation to Bergeron's deposition, which supposedly serves as an admission that PCS failed to timely process claims. (See Pl. S. Add'l M.F. ¶ 48, *citing* PCS Depo. Tr. 183:13-23.) The cited deposition transcripts stand for the proposition that late payments would be a breach, but do not go so far as to include an admission that any particular payment was late.

9

class members' recovery is limited to the value of unpaid claims, and because all claims have been fully paid, the class cannot sustain an action for breach of contract. (PCS Opp'n 8) (citing authority that damages are an essential element of a breach of contract claim). Under PCS's theory of the case, even if there is no genuine issue of material fact as to the existence of the contract and PCS's breach of one of its contractual duties, it is still entitled to judgment as a matter of law because plaintiffs cannot satisfy their burden of proving any damages resulting from the breach.

That may be true now, but it was not true as of the commencement of the litigation. Thus, this case raises the interesting question of whether a party that had provable damages for a valid breach of contract claim loses its ability to obtain judgment as a result of being made whole during the pendency of the action. In this case, that question is relevant mainly to the issues of interest and costs.

Failure to Provide 90 days Notice Prior to Cancellation of Services

In their motion for summary judgment, Plaintiffs contend that PCS breached its service agreements with the providers by failing to provide 90-day notice of its termination of the agreements. (Pl. Mot. Summ. J. 3.) According to PCS Defendants, such a claim is not before the court because it was not contained in the complaint nor has it been certified as a class claim pursuant to Rule 23. Additionally, PCS Defendants argue that this claim could not be presented as a class claim because many of the providers, including three of the class

10

representatives, resigned from PCS and therefore did not fall victim to PCS's cancellation. (See PCS S. Add'l M.F. ¶¶ 25-28, 31, 32.)

The court agrees that a breach of contract claim relying on PCS's failure to provide 90-day notice of cancellation is not properly before the court in the present class action suit.

### B. The Settlement and Service Agreements of December 1, 2010 between PCS and AFI

In February 2012 the Plaintiffs supplemented their Amended Consolidated Class Action Complaint to include a breach of contract claim arising from PCS's and AFI's alleged failure to timely process EOB claims in violation of the Service Agreement between PCS and AFI executed on December 1, 2010. Plaintiffs allege that they were third party beneficiaries to this agreement and that the agreement required PCS to work together with AFI to timely process claims and maximize the amount of money recovered from the viable claims belonging to the plaintiff class. (Pl. Mot. Summ. J. 12-13.) In a separate order, the court has determined that the AFI Defendants are not liable for any failure to process EOB claims in a timely manner.

As to PCS, the Plaintiff class asserts that PCS breached its contract with class members when it failed to perform its "role" and "ceased any efforts" in gathering money from MaineCare and third-party payers. (Pl. Mot. Summ. J. 13.) The PCS Defendants argue that "PCS fully complied with its contractual obligations under the Settlement Agreement with AFI (and the incorporated

11

service agreement), fully cooperating with AFI and the Referee." (PCS Cross Mot. Summ. J. 9.)

PCS's contracts with providers at least implicitly required PCS to process providers' EOB claims in a reasonably timely manner, there being no explicit deadline or timeframe for PCS's submittal of EOB claims to the insurers involved. The fact that PCS contracted with AFI to perform PCS's duties with regard to processing EOB claims does not relieve PCS of liability under its contracts with Plaintiff class members.

On the other hand, nothing in the PCS contract with providers appears to prohibit PCS from assigning or, in effect, subcontracting, its claim processing responsibilities. PCS is entitled to summary judgment on this issue.

## IV.   Unjust Enrichment (Count IX)

In the alternative, Plaintiffs assert that PCS has been unjustly enriched under the Service Agreement executed on December 1, 2010. PCS has received $74,950 in disbursements from the Referee's account, and plaintiffs argue that this disbursement was unjustly made to PCS where that entity had not fulfilled its duty to assist in the timely processing of claims.

The elements of an unjust enrichment claim are (1) that the plaintiff conferred a benefit on the defendant; (2) that the defendant appreciated or had knowledge of the benefit; and (3) that defendant's acceptance or retention of the benefit was under such circumstances as to make it inequitable for defendant to retain the benefit without payment of its value. According to plaintiffs, PCS's

12

receipt of the $74,950 was inequitable because "it was performing little, if any, of its promised work to facilitate claims." (Pl. Mot. Summ. J. 14.)

Most importantly, however, plaintiffs have failed to raise a question of fact regarding whether they ever conferred a benefit upon the PCS Defendants. Though the PCS Defendants received funds from the Referee's account, there is no indication that the Plaintiff class had any legal right or interest in the funds that were disbursed to any of the Defendants. In fact, the court limited disbursements from the Referee account specifically to assure that sufficient funds remained to cover any cognizable claims of the class.

V.    "Equitable" Claims

Plaintiffs also allege Accounting[3] (Count V), Money had and Received[4] (Count VIII), Conversion (Count X), and Constructive Trust (Count XI). All of these claims share the common requirement that PCS defendants must have been in possession of funds or property to which the plaintiffs hold title or some other ownership interest. *See Ketch v. Smith,* 161 A. 300, 300 (Me. 1932) (money had and received); *Baizley v. Baizley,* 1999 ME 115, ¶ 6 734 A.2d 1117 (constructive trust); *Withers v. Hackett,* 1998 ME 164, ¶ 7, 714 A.2d 791 (conversion).

As just noted, there is no indication that the PCS Defendants have received funds to which the plaintiffs had any ownership interest. Plaintiffs' only assertion is that it would be unfair for PCS to receive funds where PCS failed to

---

[3] "Accounting" is more appropriately characterized as an equitable remedy for a potential unjust enrichment claim.

[4] The court notes that an action of assumpsit for money had and received arises in law, though it is "equitable in spirit and purpose." *Greenlaw v. Rodick,* 158 Me. 440, 446, 185 A.2d 895, 898 (Me. 1962).

13

fully process all claims under the settlement agreement. There are no facts in the summary judgment record to indicate how this perceived injustice has affected plaintiffs' legal rights. Accordingly, an accounting is not appropriate and the PCS Defendants are entitled to summary judgment on Counts V, VIII, X, and XI.

VI.    Fraud (Count IV) and Negligent Misrepresentation (Count VI)

The elements of fraud include (1) that one party made a false representation; (2) of a material fact; (3) with knowledge of its falsity or in reckless disregard of whether it is true or false; (4) for the purpose of inducing another party to act in reliance upon it; and (5) the other party justifiably relied upon the representation as true and acted upon it to its damage. *Flaherty v. Muther*, 2011 ME 32, ¶ 45, 17 A.3d 640 (citation omitted).

The record establishes that the individual Plaintiffs do not have any viable fraud claim against the PCS Defendants, especially given the clear and convincing standard of proof applicable to claims of fraud. One may be found liable for negligent misrepresentation if, in the course of any transaction in which he has a pecuniary interest, he fails to exercise reasonable care in communicating false information to others and causes pecuniary loss by their justifiable reliance upon the information. *Rand v. Bath Iron Works Corp.*, 2003 ME 122 (Me. 2003). On this claim, as well, the record does not support the Plaintiff class. Summary judgment is granted for the PCS defendants on Counts IV and VI.[5]

---

[5] Because the fraud and negligent misrepresentation claims contain the essential element of reliance, these counts are only brought by the four individual named plaintiffs and do not

14

*Conclusion*

Plaintiffs' Motion for Partial Summary Judgment is granted in part, as to the issue of breach of contract for purposes of Count I, and is otherwise denied. The PCS Defendants' Cross-Motion to Enter Summary Judgment is granted as to all counts of the Consolidated Amended Class Action Complaint except for Count I, as to which the cross-motion is denied.

Pursuant to M.R. Civ. P. 79(a), the clerk is hereby directed to incorporate this order by reference in the docket.

Dated 18 July 2012

A. M. Horton
Justice, Business & Consumer Court

Entered on the Docket: 7/20/12
Copies sent via Mail ___ Electronically ✓

---

pertain to the class as a whole. *See* Order Granting Class Certification, *Richman, et al. v. Possibilities Counseling Services, Inc., et al.*, Docket No. BCD-CV-10-53, 4 (Me. Super. Ct., Jul. 12, 2011).

15

BCD-CV-10-53

Nicole Richman., et al

        Plaintiff(s)

v.

Possibilities Counseling., et al

        Defendant(s)

Attorneys:

For Plaintiff:  Randall B. Weill, Esq.
              Gregory P. Hansel, Esq.
              Preti Flaherty
              Adam S. Taylor, Esq.
              Gregg R. Frame, Esq.
              Taylor McCormak & Frame, LLC.

Affiliate Funding:  Melissa Hewey, Esq.
                   Drummond Woodsum

Foster Care Billing, LLC:  Melissa Hewey, Esq.
                       Drummond Woodsum

Emile L. Clavet:  Melissa Hewey, Esq.
                Drummond Woodsum

Kevin Dean:  Melissa Hewey, Esq.
            Drummond Woodsum

Possibilities Counseling Services, In:  Russell Pierce, Esq.

Wendy Bergeron:  Russell Pierce, Esq.
                Norman Hansen & Detory